**SIGNED this 27th day of July, 2015**

_Shelley D. Rucker_

Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:                                                      No. 09-12716
                                                            Chapter 7

MICHAEL WOLFGANG SCHMANK,

      Debtor;


DWIGHT JENKINS, individually and
J & S CONSTRUCTION,

      Plaintiff,

        v                                      Adversary Proceeding
                                                            No. 09-1111

MICHAEL WOLFGANG SCHMANK
d/b/a CUMBERLAND LOG HOMES,

      Defendant.

1

## MEMORANDUM

Plaintiffs Dwight Jenkins and J & S Construction ("J & S") (collectively "Plaintiffs") have filed this action against the defendant debtor Michael Wolfgang Schmank ("Defendant" or "Debtor") alleging that the Defendant misused their funds and that such debt should be non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6). Although the Plaintiffs cited 11 U.S.C. § 727 in their complaint (Doc. No. 1, "Complaint"), they withdrew their claims under section 727 prior to trial.

The Plaintiffs identify three claims which they contend are nondischargeable. The first is a claim for an advance of $13,500 paid to the Defendant based on future partnership distributions. The Plaintiffs have alleged this advance was made based on false pretenses or fraud. The second claim is for $11,500 which was either the amount taken by the Defendant pursuant to an undisclosed subcontract entered into in violation of his fiduciary obligations as a partner, or in the alternative, was a conversion of funds due to a subcontractor. The third is a claim for the lost profits from a contract which the Plaintiffs contend the Defendant caused to terminate resulting in a loss of profits to the partnership.

The court finds that the Plaintiffs have carried their burden of proof as to only the second claim, and the court will grant the plaintiffs a nondischargeable judgment in the amount of $11,500. The court further finds that the plaintiffs are entitled to attorney fees for their claims of fraud and misrepresentation. The court will set a deadline for the Plaintiffs to file an itemized statement of their fees and expenses. The court will also give the Defendant an opportunity to respond and the court will then set a hearing on the amount of attorney's fees to be awarded. For the reasons stated below the court is denying the request for punitive damages.

These are the court's findings of fact and conclusions of law pursuant to Fed.R.Bankr. P. 7052.

## I.      Background Facts

In the spring of 2008, the Defendant was experiencing financial difficulties. He was out of work and behind on his mortgage payments and his car payments. He had previously earned his living building log homes. When he was contacted by a log supplier with whom he had previously worked about an opportunity to build homes in a development in Roane County, Tennessee, he realized he would not be able to take advantage of the opportunity because of his financial condition. He approached Mr. Jenkins in the spring of 2008 with the opportunity to work with the developer. He proposed a partnership to construct residential log homes in a subdivision known as the Eagle Ridge Development located in Roane County, Tennessee being developed by Duff Development, LLC. If the first home went well, he was hopeful that there might be an opportunity to build many more in the development.

He had met Mr. Jenkins through a high school football booster program in which both men participated. Both had sons who played football for the school. Mr. Jenkins had been in the construction business for about 30 years and was a licensed contractor. The Defendant had had roughly the same amount of experience in the log home construction business although he was not a licensed contractor.   Mr. Jenkins visited the proposed project and decided that he would enter into the deal with the Defendant. The two agreed the Defendant would manage the project for a share in the partnership's profits. Mr. Jenkins would supply the money and contractor's license. They negotiated a contract to build a log home with Duff Development LLC, opened a bank account, and entered into a general partnership agreement as J&S General Contractors ("J&S") on

April 28, 2008. Their partnership agreement was memorialized in a document entitled

"Partnership Contract Agreement" ("Agreement"). [Trial Ex. 1.]

The Agreement states in relevant part:

THIS PARTNERSHIP AGREEMENT ("Agreement") is entered into by and
between Michael Schmank . . . and Dwight Jenkins . . . .
1.   Both Michael Schmank and Dwight Jenkins are residence [sic] of Bradley
County, Tennessee. The said partners are hereby known in this agreement as the
("Parties"). Parties are also know[n] in this agreement as Dwight Jenkins ("Owner
one") and Michael Schmank as ("Owner two") for clarification of duties in the
agreement.
2.   The Parties have agreed to contract in a joint Partnership company doing
business as J&S General Contractors using the mailing address as PO Box 113,
McDonald, TN. 37352.
3. Owner one will act in the capacity of Owner/General contractor licensed in the
state of Tennessee. Owner two will act in the capacity of Owner/Project field
Manager. Owner two will become incensed [sic] in the future as requirements are
deemed.
4. Parties agree to work in combined capacities. Parties will consult with each other
regarding all business matters, decisions, costs, and all subjects regarding to each
other and the partnership. Owner two will consult with Owner one regarding to and
or [sic] all matters pertaining to each project. Owner two will consult with but not
limited to all final decisions with Owner one regarding project matters [sic].
5. Proceeds/profits will be paid as follows; the fifteen percent termed in each
contract is split as 5% /10%. Owner one will receive five percent of the net profits
for each contracted project. Owner two will receive ten percent of the net profits for
each contracted project. Parties agree to equal share ("50/50") of the net profits
when fixed price contracts are made. Payments from profits will be paid to parties
after all invoices, bills, reimbursements, and debts have been paid by the company.
6. J&S General Contractors will conduct and obtain a DBA account with First
Tennessee Bank, located in Cleveland, TN. Parties agree that such account will
require the signatures of both parties thus defined as ("Dual Signature account").
Upon termination of this partnership, the account and its worth will be divided as
per the terms of the agreement ("5/10"). Only after current and outstanding projects
are finished and or debts owed by the company are paid will such actions proceed.
In cases of contracts terms as Fixed Price agreements, monies received from these
projects will be divided as ("50/50") and paid to the parties as termed above.
7. Parties agree to contract with said public as J&S General Contractors. Contracts
will be termed as Cost plus Construction Agreements but not limited to Fixed cost
agreements.
8.   Cost Plus is defined as: cost of materials, labor, or any other cost to construct
and complete homes under contract Plus Fifteen percent commission payable to

J&S General Contractors. Each partner will receive said funds after all invoices,
bills, debts, and any funds owed by the company are paid in full. Owners proceeds
[sic] will be paid from the company account, each owner will be liable for there
[sic] taxes and other state and federal requirements.

9.   Any changes to this agreement can acure [sic] only if agreed on by both parties
and a written addendum is created in writing.

TERMINATION OF AGREEMENT:

In the event that the parties decide to terminrate [sic] this partnership, the parties
agree to the following.

Parties agree to complete any outstanding contracts or projects. Parties will divide
all assets obtained by the partnership and will retain all assets individually owned
by each owner. Cash assets will be divided as explained above in paragraph six of
this agreement.

[Agreement.]

A couple of days before signing the Agreement, J&S had executed a contract with a James

David Duff d/b/a Duff Development, LLC ("Duff") on April 25, 2008. In the contract, J & S

agreed to construct residential improvements to Lot 16, Unit 1 in the Eagle Ridge subdivision in

Rockwood in Roane County, Tennessee. The project was a fixed price contract for $415,525.

[Trial Ex. 14, p. 2.] J&S expected to receive $50,000 in profits upon its completion. [Trial Ex. 15,

p. 1.] The profits were to be split 50/50 according to the Agreement. The contract called for a

$15,000 advance and monthly progress payments going forward. [Trial Ex. 14, par. 4.]

In the beginning of the partnership and as the Eagle Ridge project was commencing, the

Defendant asked the Plaintiff for an "advance payment" from the $15,000 advance to help him pay

his bills. The Defendant agreed that the advance would be offset against his share of the profits to

be made on the Duff project. Mr. Jenkins, knowing the Defendant's financial condition and after

conducting his own due diligence on the project, provided the Defendant with an advance in the

form of a check drawn on the J&S account in the amount of $13,500 dated April 25, 2008. [Trial

Ex. 5.]

That same day, the Defendant opened two accounts at First Tennessee Bank—one in the name of Mike Schmank d/b/a Integrity Log Homes (the "Integrity Account") and a second account in the names of Mike and Lori Schmank (the "Personal Account"). [Trial Ex. 11 and 12.] When questioned about the operations of Integrity Log Homes at his deposition in 2008, the Defendant had stated that Integrity had ceased its operations in 2007 and did not operate after he entered into the Agreement with Mr. Jenkins. [Trial Ex. 19, Deposition of Michael Schmank, pp. 13-15, lines 9-23.] At trial, Defendant contended that Integrity was a subcontractor on the Duff project to do the dry-in for the house. When questioned about his inconsistent positions on the date Integrity stopped operations, the Defendant repeatedly said he did not understand the questions. The court views the questions as clear, but the Defendant's responses as evasive. The Debtor's testimony at trial clearly indicated that he intended to do business as Integrity Log Homes and use that business to act as a subcontractor on the project. These statements lead the court to conclude that the Defendant's testimony at his 2008 deposition was untrue and inconsistent with his intention to use Integrity Log Homes as the subcontractor for the dry-in of the project without disclosing to his partner that he intended to obtain additional profits for himself.

With respect to the advance of $13,500, $11,500 was deposited by Defendant into the Personal Account. The advance was used to pay ongoing and personal living expenses, debts, etc. unrelated to the partnership or the project. [Trial Ex. 12.] The Defendant testified that he used the remaining $2,000 to pay Vance Stephens who was going to work on the Defendant's crew to do the "dry-in." [Testimony of M. Schmank, June 9, 2015 at 9:55:10.] The Defendant testified that Mr. Stephens came to his house to get the $2,000 in cash. [*Id*. at 9:55:50.] He stated that this payment was made because the job start date was late and Mr. Stephens had complained that he

was tired of waiting to receive some money. [*Id*. at 9:55:40.]

Mr. Stephens, a resident of Kentucky, whose deposition was offered as evidence, testified that he was hired to handle the dry-in for about $45,000. He contradicted the Defendant's recollection about an initial cash payment of $2,000. [Trial Ex. 20, Deposition of Vance Stephens, p. 21, lines 14-15.] Mr. Schmank produced a receipt at trial for $2,000 signed by Vince Stephens. Mr. Stephens testified that he did not recognize the receipt, and he denied that it was his signature on the receipt. [*Id*. at lines 2-13.] Although there were other deposits made to the Personal Account, the Defendant did not admit that any of the amounts were attributable to the $2,000 which was not initially deposited with the advance. The court does not find the Defendant's testimony that he paid $2,000 to Mr. Stephens to be credible.

In May, Duff made a second payment on account of the contract, but this payment was not made to J&S. The contract provided for progress payments to be made to the Contractor, defined as J&S. [Trial Ex. 14, par. 4.] If the Owner, defined as Duff, paid a supplier, installer or service performer directly, it was entitled to deduct the payment from the price for any item on Exhibit B. [*Id*.] No exhibit B was attached to the trial exhibit. Instead, Duff issued a check to "Log Home Builders," in the amount of $23,000. [Trial Ex. 6.] This amount represented one half of the amount allocated to the cost of the "dry-in" of the home. [Trial Ex. 15.] The Defendant testified that *he* gave Duff the name Integrity Log Homes as the party to whom the check should be payable. [Testimony of M. Schmank, June 9 at 10:15:40.] Contrary to the terms of the Agreement, the Defendant did not consult with Mr. Jenkins concerning the decision to have the check made payable to Integrity Log Homes. [Trial Ex. 1, para. 4.] In fact, Mr. Jenkins testified that he did not hear of Integrity Log Homes until a couple of months later when he began investigating why J&S

7

was not being paid.   The Defendant argued in closing that the contract provided for the payment of subcontractors directly which justified the Defendant disregarding the terms of the contract. The court does not find the limited exception for credits due to payments to subcontractors listed on an exhibit that was not offered at trial to be a sufficient explanation for the Defendant's unauthorized, and undisclosed to his partner, instruction to make the check payable in a manner that was in violation of the terms of the contract.

The Defendant's subsequent conduct and the testimony of Mr. Stephens also contradict his explanation. The $23,000 check was dated May 23, 2008. [Trial Ex. 6.] On May 23, 2008, the $23,000 check was deposited into the Integrity Account. [*See* Doc. No. 98-2, Trial Ex. 11.] That same day, the Defendant wrote check no. 996 on the Integrity Account payable to himself for $10,000. [Trial Ex. 9.] This disbursement of funds to his personal use violated paragraph 5 of the Agreement. [Trial Ex. 1, para. 5 ("Payments from profits will be paid to parties after all invoices, bills, reimbursements, and debts have been paid by the company.").]   On May 23, 2008, the sum of $9,500 was deposited into the Personal Account. [Trial Ex. 12, p. 5.]

Mr. Jenkins testified that the Defendant informed him that Duff had paid Vance Stephens the $23,000. The Defendant did not mention Integrity Log Homes or the Defendant's withdrawal of $10,000 from the amount paid. Mr. Jenkins testified that he was upset that Mr. Stephens had been paid for half of his work when not nearly that much had been completed. He discussed those concerns with the Defendant, but decided not to confront Mr. Stephens based upon the Defendant's assurances that Mr. Stephens would complete the work even though the payment exceeded the amount of work done.

The Defendant testified that he had told Mr. Jenkins that he would handle the dry-in and

8

that he had meant that he would be the subcontractor for the dry-in phase. As the subcontractor, he believed he would be entitled to make a profit. All of these contentions appear to be the Defendant's internal rationalizations for taking the $10,000, because they were not expressed to Mr. Jenkins. At trial, the Defendant also testified that he took the $10,000 because he thought he was entitled to be paid back for his gas and work. The court does not find this explanation to be credible because there were two other withdrawals made from the J&S account to reimburse the Defendant for these costs. Mr. Jenkins agreed to these withdrawals and signed the checks with Mr. Schmank. [Trial Ex. 17, p. 2.] There appears to have been another procedure for handling Mr. Schmank's expenses.

The court does not find the Defendant's explanation that he was the subcontractor and was entitled to a profit for his work to be credible. The construction cost estimate prepared by Mr. Jenkins and the Defendant lists $46,000 for "Dry In Complete." [Trial Ex.15.] The payment of $23,000 was half of the budgeted cost. Mr. Stephens's testimony does not corroborate Mr. Schmank's contention that Integrity Log Homes was the subcontractor. Mr. Stephens testified that he thought he was working for the Defendant, but was not aware that Integrity Log Homes was involved. [Trial Ex. 20, p. 12.] There was no written agreement between Integrity Log Homes and J&S. There was no written agreement between the Defendant and Mr. Stephens. [Trial Ex. 20, Deposition of Vance Stephens, p. 6, lines 6-13.]

Mr. Stephens also testified that his agreement with the Defendant was to do the dry-in for "around $45,000." [Trial Ex 20, p. 15-16, lines 15-8.] The price was to be paid in three installments, "15 to start, 15 at the second floor, and 15 when the felt was on."   Based on this testimony, the difference in what would be owed to Mr. Stephens and what was budgeted was only

9

$1,000, not $10,000. The court finds that there was no extra $10,000 in profit from the dry-in

subcontract to pay the Defendant.

The proof offered at trial showed that Mr. Stephens received the following payments:

| | | |
|---|---|---|
| May 28, 2008 | $ 6,000 | [Trial Ex. 7.] |
| June 11, 2008 | $ 5,500 | [Trial Ex. 8.] |
| June 25, 2008 | $ 2,000 | [Trial Ex. 17.] |
| July 9, 2008 | $ 3,000 | [Trial Ex. 17.] |
| July 21, 2008 | $ 4,000 | [Trial Ex. 17.] |
| July 25, 2008 | $ 1,000 | [Trial Ex. 17.] |
| Total | $21,500 | |

Mr. Schmank testified that he paid $2,000 in cash on April 25, 2015 and another $2,000 in

cash between May and August when the contact ended. The Defendant stated that the second cash

payment was made to Stephens' crew "so that the workers did not need to return to Kentucky to

cash a check." [Doc. No. 102, Defendant's Trial Brief, p. 3.] Mr. Stephens denies receiving any

funds in cash and does not recall receiving the $3,000 payment. The check for $3,000 does not

have an endorsement, so there is no documentary evidence that the check was deposited or cashed

by Mr. Stephens. He testified that he completed half the job and was owed about $20,000 for the

work. [Trial Ex. 20, p. 25, lines 4-6.] As noted above, Mr. Jenkins' records indicate that Mr.

Stephens received $21,500. [Trial Ex. 7, 8, and 17.] The court finds that Mr. Jenkins paid $10,000

to Mr. Stephens in addition to the two payments which Mr. Schmank made.

The account statements of Mr. Jenkins show that Mr. Jenkins funded the last four payments

made to Mr. Stephens which total $10,000. His records show that the $3000 was paid to Mr.

Stephens. Had the funds from the Duff payment to "Log Homes Builders" not been taken by the

Defendant, there would have been funds available to pay Mr. Stephens from the Duff $23,000

payment.

10

The next draw request prepared by the Defendant and submitted for payment in June had not been paid by Duff by early July, and the Defendant began advocating that J&S stop work. After consultation with the Defendant, Mr. Jenkins made a decision to continue. The Defendant testified that he tried to reach Mr. Duff on numerous occasions and received no response, making him further concerned about Duff's ability to keep paying. In late July, the Defendant's son had a medical emergency and the Defendant took some time off to be with his son with Mr. Jenkins' knowledge and approval. Mr. Jenkins took up the collection efforts on the project and went to a meeting at the site with Tye Dixon, a representative for Duff.

At this meeting, Mr. Jenkins saw the project which he described as being in disarray. He saw trash, rusted or damaged building materials which appeared to have been left out in the weather and learned that Mr. Stephens had refused to continue work until he was paid. Mr. Jenkins questioned Mr. Dixon about why that was Mr. Stephens' position when he had received half the money, but the dry-in was not half complete. He then called Mr. Stephens and learned that Mr. Stephens had not received the $23,000. He testified that it dawned on him that something else was wrong and that he suspected his partner was taking money. He moved quickly to retain an attorney and file suit in Bradley County Chancery Court for a restraining order and to dissolve the partnership. [Trial Ex. G and H.]

Mr. Jenkins later informed Duff that he was closing down the partnership and worked out an arrangement with Duff to complete the work up to the percentage for which J&S had been paid. Duff agreed to pay for any additional amounts that were expended to get the construction to that point, except for the dry-in. The proof was unclear whether the residence was completed. Mr. Stephens testified that he continued work until the felt on the roof was installed. The Defendant

11

offered a substitute trustee's deed which reflects that the property was foreclosed by the mortgage holder in February of 2010, and the foreclosure bid was $180,000 by Community Trust Bank. [Trial Ex. C.] Community Trust Bank, Inc. later sold the house in September of 2013 for $130,000. [Trial Ex. D, p. 3.] No additional proof was offered as to whether Duff had the financial ability to complete the project.

The appropriate party to charge with breach of the construction contract is unclear. Although there was testimony that Duff was not paying within ten days of receiving the invoice, there was no evidence that J&S sent any notice of default to Duff. Mr. Jenkins stated that there was not a payment breach by Duff because not enough work had been done to have required more money to be paid. He, however, did not state what the percentage was that had been completed nor did the Plaintiffs offer any proof that Duff had the wherewithal to complete the project. Finally, the contract termination letter dated August 8, 2008 which listed the defaults of the contractor does not provide the required seven days to cure the defaults. [Trial Ex. 18.] Duff appears to rely on conversations which he had had with Mr. Jenkins that lead the owner to believe that J&S was repudiating the contract. [*Id.*] The Defendant testified that he received the lawsuit filed by Plaintiffs before he received the termination letter. He did not take any action because he was restrained from any contact with the building site, Duff, or the partnership records.

The Plaintiffs offered a spread sheet showing their out of pocket expenses for J&S totaled $98,279.68. Of that amount, J&S admits that it received from Duff, $87,332.18 excluding the $23,000 for the dry-in. Of the receipts, J&S advanced $13,500 to the Defendant bringing the out of pocket losses for the partnership to $24,447.50. [Trial Ex. 17, p. 1.] Without the $13,500 advance, the loss is $10,952.50.

12

The Plaintiffs also request attorneys' fees and possible punitive damages. The Plaintiffs filed a lawsuit in Chancery Court of Bradley County, Tennessee, on August 8, 2008 seeking dissolution of the partnership and other redress. On May 3, 2009 just prior to the scheduled trial date, the Defendant filed his Chapter 7 bankruptcy petition. [Bankruptcy Case No. 1:09-12716, Doc. No. 1.]

The Defendant alleges that the Plaintiff withdrew $47,485.19 from the partnership account on November 28, 2008. The Defendant did not file a counterclaim for any portion of these funds based on the terms of the Agreement. The court does not find that there was any evidence that the Defendant made any financial contributions to the project or to the bank account of J&S.

## II.     Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district provide this court with jurisdiction to hear and decide this adversary proceeding. The Plaintiffs' action regarding the dischargeability of particular debts is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

## III.     Analysis

## A.     Discharge Pursuant to 11 U.S.C. § 523(a)(2)(A)

11 U.S.C. § 727 provides for discharge from debt unless excepted from discharge pursuant to 11 U.S.C. § 523. 11 U.S.C. § 727(b). 11 U.S.C. §§ 523(a)(2)(A), in turn, states in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt – . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . . .

13

11 U.S.C. § 523(a)(2)(A). The creditor must prove by a preponderance of the evidence that a debt

is nondischargeable under 11 U.S.C. § 523. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct.

654, 659 (1991). Exceptions to discharge are narrowly construed in the debtor's favor. *See*

*Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004).

The Sixth Circuit has held that to demonstrate nondischargeability pursuant to 11 U.S.C. §

523(a)(2)(A), a creditor must prove four elements:

> (1) the debtor obtained money through a material misrepresentation that, at the
> time, the debtor knew was false or made with gross recklessness as to its truth; (2)
> the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the
> false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.

1998). A creditor bears the burden of demonstrating these elements by a preponderance of the

evidence. *Id.* at 281.

In *In re Vitanovich* the Sixth Circuit Bankruptcy Appellate Panel addressed the meaning of

"actual fraud" within the context of § 523(a)(2)(A):

> We adopt the position of the Court of Appeals for the Seventh Circuit that actual
> fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and
> misleading omissions. When a debtor intentionally engages in a scheme to deprive
> or cheat another of property or a legal right, that debtor has engaged in actual fraud
> and is not entitled to the fresh start provided by the Bankruptcy Code.

*Mellon Bank v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (citing

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)). The Sixth Circuit Bankruptcy Appellate

Panel made clear that it finds that "actual fraud" is broader than a misrepresentation and

encompasses "any deceit, artifice, trick, or design involving direct and active operation of the

mind, used to circumvent and cheat another." *In re Vitanovich*, 259 B.R. at 877 (citing *McClellan*,

14

217 F.3d at 893). The Sixth Circuit Bankruptcy Appellate Panel further explained that:

> "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud."

*In re Vitanovich*, 259 B.R. at 877 (quoting *Gerad v. Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)) (other quotation omitted).

With respect to the first element of "material misrepresentation," courts in this Circuit have held that " 'material misrepresentations' are 'substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision.' " *Whitaker v. Koenig*, 418 B.R. 265, 271 (E.D. Tenn. 2009) (quoting *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003)).

With respect to the element of material misrepresentation, the court does not find that the Defendant made any misrepresentations about his need and his use for the $13,000 advance. He disclosed his financial difficulties to his partner who knew that there was a risk that the project would not be successful. The Defendant spent the money to pay his bills and his living expenses as he represented that he would. There being no misrepresentation, the court finds that the Plaintiffs have failed to prove the first element of their claim for the $13,500 advance. The court also does not find that this first advance was part of a scheme to defraud the Plaintiffs with respect to the project generally. Duff existed and there was a subdivision it was developing. Mr. Jenkins, after becoming aware of the problems with the payments to Integrity, proceeded to work with Duff to mitigate what he perceived to be the partnership's damages for failing to complete the project. The court does not find that the contract was part of a scheme to defraud Mr. Jenkins. It appears to have been a genuine contract which was ultimately an unsuccessful real estate project started in the

spring of 2008—a time when many real estate projects were failing. The Plaintiffs have not shown

by a preponderance of the evidence that the Defendant's representations about Duff and the

contract were part of a fraudulent scheme to induce Mr. Jenkins to enter into the partnership.

The court also does not find that there was any fraud with respect to the Plaintiff's claim of

profits from the job. The contract existed and the Plaintiffs offered no evidence that the Defendant

offered any information regarding the nature of the project or the costs to complete that were

untrue. He did make statements about Duff having financial difficulties which the Plaintiffs chose

to disregard. The Plaintiffs did not refute the fact that the real estate was foreclosed by the lender

who had extended credit to Duff; nor did they prove that Duff would have and could have

completed the project but for Defendant's failure to manage the construction. Duff did continue to

work with Mr. Jenkins after the Defendant stopped work. It appears from the testimony of Mr.

Jenkins and the contents of the termination letter that Mr. Jenkins made a business decision to

close down J&S to mitigate the partnership's potential damages.   The court does not find that the

Plaintiffs have proven the existence of misrepresentations or fraud with respect to their claim for

lost profits.

The element of misrepresentation is present in the second claim for the funds used by the

Defendant taken from the $23,000 check. The Defendant admits that he gave Duff the instructions

to write the check to his company. That act allowed him to control the disbursement of those funds

without the participation of Mr. Jenkins. He misrepresented to his partner that the check had gone

to Vance Stephens. He did not disclose that he had taken $10,000 of it the day he received it. The

court finds that the Plaintiffs have proven misrepresentation as to $11,500, which is the amount the

Defendant used for his personal expenses from the check.

In determining whether the second element, the intent to deceive, has been proven courts

consider whether " 'the totality of the circumstances 'presents a picture of deceptive conduct by

the debtor which indicates an intent to deceive the creditor.' " *Whitaker*, 418 B.R. at 272 (quoting

*In re Copeland*, 291 B.R. at 766) (other quotation omitted).

The court finds that the Plaintiffs have proven that the Defendant had the intent to defraud

them. The Defendant testified that Integrity Log Homes had stopped doing business before he

entered into the Agreement. That was not the case. The Defendant opened new bank accounts for

Integrity Log Homes when he first received the advance. He then disbursed the money, which he

had received to pay the dry-in subcontractor, from the account to himself in violation of the terms

of the Agreement. He tried to explain away any deceptive intent by testifying that he immediately

told Mr. Jenkins that Duff had paid $23,000 for the dry-in. The court would have found that

persuasive if the Defendant had been as candid about the payee on the check and how the funds

were distributed as he had been in describing his need for an advance.   He did not tell Mr. Jenkins

that he instigated the change in procedure so that the check would be payable to his business rather

than the partnership. He misled Mr. Jenkins about who had control of the money. He told Mr.

Jenkins that Vance Stephens had been paid and that he should not worry because Vance would do

the work. He never told Mr. Jenkins that he believed that he was entitled to additional profits as the

subcontractor and had taken $10,000 for himself. When the second draw was not paid, the

Defendant blamed the problems on Mr. Duff's inaccessibility rather than disclose that the project

was behind schedule and he had no more money with which to pay Mr. Stephens. He would not

disclose Mr. Stephens phone number to Mr. Jenkins so that the accounting for Mr. Stephens's

payments could be reconciled. All of this appears to be an effort to cover up the use of funds that

were to have been used to pay Mr. Stephens. The court finds this course of activity was an effort to conceal his actions at a time when he was having financial difficulty. The court finds that asking Duff to pay the subcontractor directly, using the funds, and concealing this all from Mr. Jenkins demonstrate the requisite intent to defraud.

With respect to the element of justifiable reliance in § 523(a)(2)(A), the Sixth Circuit in *In re Rembert* noted that justifiable reliance is a subjective standard. 141 F.3d at 280, n.2. The Sixth Circuit has also provided guidance regarding factors to consider when analyzing justifiable reliance. *See BankBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992). In *In re Ledford*, decided before *In re Rembert*, the Sixth Circuit addressed the issue of reasonable reliance in the context of § 523(a)(2)(A):

> Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

970 F.2d at 1560. In *In re Ledford* the Sixth Circuit explained its decision to require the demonstration of reliance by the creditor, even though the requirement is not made explicit in the statute.

> In *In re Phillips*, 804 F.2d 930, 933 (6th Cir. 1986), we concluded that even though there is no explicit reasonableness requirement in § 523(a)(2)(A), the approach spelled out in *Garman* and *Martin* applied to § 523(a)(2)(A) as well. The reasonableness requirement of *Phillips* was not particularly rigorous; we viewed the requirement as a filter intended to isolate creditors who had acted in bad faith. As the *Garman* court said, the decisions that refer to "reasonable" or justifiable reliance do not require the court to undertake a subjective evaluation of a creditor's

18

> lending policy and practices; the decisions teach only that dischargeability should not be denied where a creditor's asserted reliance would be so unreasonable as to negate any actual reliance.

970 F.2d at 1559-60 (citing *Northern Trust Co. v. Garman (In re Garman)*, 643 F.2d 1252, 1256

(7th Cir. 1980); *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir.

1985), *abrogated on other grounds by Grogan*, 498 U.S. 279). The district court in *Whitaker* noted

that, with respect to justifiable reliance, creditors "must prove that they actually relied on [a

debtor's] representations and, based upon the facts and circumstances known to them at the time,

that their reliance was justifiable." 418 B.R. at 273 (citing *Haney*, 291 B.R. at 767).

The court finds that the Plaintiffs have proven that Mr. Jenkin's relied on the Defendant's

misrepresentations and that the reliance was reasonable. The Defendant had been honest about his

financial situation and his representations about the project had been reviewed by Mr. Jenkins. The

two parties had worked together on the budget for the project and the contract with Duff. The

Defendant was charged with managing the project and had obtained the services of Mr. Stephens.

The Defendant came forward with the information that the payment had been made to Mr.

Stephens. When the Defendant offered the explanation about the check to Vance Stephens, there

was no reason for Mr. Jenkins to believe that this was not the truth. Defendant also assured Mr.

Jenkins that Mr. Stephens would complete the job when Mr. Jenkins suggested getting in touch

with Mr. Stephens directly.

The final element is the existence of damages proximately caused by the

misrepresentation. To demonstrate proximate cause, a creditor must prove a " 'direct link between

the alleged fraud and the creation of the debt.' " *Whitaker*, 418 B.R. at 274 (quoting *Haney*, 291

B.R. at 768). The court finds that the Plaintiffs have carried their burden with respect to this last

element at least as to $11,500. Of the $23,000 taken and deposited to the Integrity Account, it appears that $11,500 was used for a purpose other than payment of the costs to build the house. However, the Plaintiffs have shown that Mr. Jenkins came out of pocket to pay Mr. Stephens and his crew only $10,000. Had the Defendant not taken the $11,500 there would have been $10,000 left to pay Mr. Stephens to bring the project up to the percentage of completion for which Duff had paid. Although Duff paid J&S for any other out of pocket expenses, Duff received credit for the $23,000 it paid for the dry-in of which the Defendant diverted $11,500. The court concludes that the Plaintiffs have shown that the partnership suffered a loss of $10,000 which Mr. Jenkins had to cover. The court finds the Plaintiffs are entitled to a nondischargeable judgment based on misrepresentation and fraud of $10,000.

### B.      Section 523(a)(4) Claim

11 U.S.C. § 523(a)(4) states in relevant part: "A discharge under section 727. . . of this title does not discharge an individual debtor from any debt. . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." 11 U.S.C. § 523(a)(4). Federal common law will determine the meaning of the terms in Section 523(a)(4). *See SmithKline Beecham Corp. v. Lam (In re Lam)*, No. 06-68805-MGD, 2008 WL 7842072, at *3 (Bankr. N.D. Ga. Mar. 27, 2008) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901 (7th Cir. 1991); *In re Wallace*, 840 F.2d 762 (10th Cir. 1988)) (other citations omitted). The creditor must prove by a preponderance of the evidence that a debt is nondischargeable under 11 U.S.C. § 523. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654, 659 (1991).

### 1.      Embezzlement

The Sixth Circuit has explained that:

20

> [f]ederal law defines "embezzlement" under section 523(a)(4) as "the fraudulent
> appropriation of property by a person to whom such property has been entrusted or
> into whose hands it has lawfully come." A creditor proves embezzlement by
> showing that he entrusted his property to the debtor, the debtor appropriated the
> property for a use other than that for which it was entrusted, and the circumstances
> indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996), *abrogated on other*

*grounds as explained in National Devel. Servs. v. Denbleyker (In re Denbleyker)*, 251 B.R. 891

(Bankr. D. Colo. 2000) (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D.

Tenn. 1982) and *Moore v. United States*, 160 U.S. 268, 269, 16 S. Ct. 294, 295 (1895)) and (citing

*Ball v. McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)). To demonstrate

embezzlement a creditor must prove all three elements: "(1) 'that he entrusted his property to the

debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was

entrusted,' and (3) that 'the circumstances indicate fraud.' " *Cash America Fin. Servs., Inc. v. Fox*

*(In re Fox)*, 370 B.R. 104, 115-16 (B.A.P. 6th Cir. 2007) (quoting *In re Brady*, 101 F.3d at 1173).

With respect to the third element, the Sixth Circuit has noted:

> The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude
> or *intentional* wrong." Accordingly, embezzlement claims under § 523(a)(4)
> require "proof of the debtor's fraudulent intent in taking the [creditor's] property."
> As the *Brady* definition suggests, the debtor's fraudulent intent may often be shown
> by circumstantial evidence.

*In re Fox*, 370 B.R. at 116 (quotations and citations omitted). Circumstantial evidence of fraud is

sufficient, but the court must have some evidence of the deceit or scheme to find fraudulent intent.

*In re Fox*, 370 B.R. at 116-17.

    This ground for denying dischargeability does not apply to either the claim for the $13,000

advance or the lost profits. It does, however, serve as an alternative basis for the finding that the

$11,500 is a nondischargeable debt. Mr. Jenkins entrusted the Defendant with the obligation to

manage the project and to obtain payment for the partnership. The Defendant instructed Duff to

make the payment to another business, one which he could control without the oversight of his

partner. The court has previously found that the circumstances demonstrate an intent to deceive

Mr. Jenkins. The use of the funds was for a use other than paying Mr. Stephens. As to the $11,500,

all of the elements for embezzlement have been proven. Although the court finds that the

misrepresentation regarding the payment of Mr. Stephens to have generated only $10,000 in

damages based on the proof, the court finds that this ground provides a basis for finding an

additional $1,500 in damages. Had the $23,000 been deposited to the J&S account, there would

have been funds to repay the advance, since there were no partnership profits.

### 2.    Defalcation

The same could be said of a finding that $11,500 was lost due to the Defendant's

defalcation under section 523(a)(4). With respect to defalcation while acting in a fiduciary

capacity, the Sixth Circuit has provided that the preponderance of the evidence must establish: "(1)

a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." *Patel

v. Shamrock Floorcovering Services, Inc. (In re Patel)*, 565 F.3d 963, 968 (6th Cir. 2009) (citing

*Board of Trustees v. Bucci (In re Bucci)*, 493 F.3d 635, 642 (6th Cir. 2007)). In *Bucci*, the court had

found that "the defalcation provision applies to 'only those situations involving an express or

technical trust relationship arising from placement of a specific res in the hands of the debtor' " *In

re Bucci,* 493 F.3d 635, 639-40 (6th Cir. 2007)(quoting *In re Garver*, 116 F.3d 176, 180 (6th Cir.

1997). The Court further cautioned that "the term 'fiduciary capacity' is narrower here than it is in

some other contexts: section 523(a)(4) covers only 'express' or 'technical trusts' and not trusts

arising out of 'the very act of wrongdoing.' " *In re Patel*, 565 F.3d at 968 (quoting *Davis v. Aetna

22

*Acceptance Co.*, 293 U.S. 328, 331, 55 S. Ct. 151 (1934)).

The Plaintiffs rely on the existence of a partnership to establish a pre-exiting fiduciary relationship. They cite the Defendants failure to deliver the $23,000 check from Duff to the partnership account as the act of wrong doing that constitutes a breach of that duty. The Defendant's use of $11,500 of those funds for his own use rather than satisfaction of the obligations for the dry-in resulted in the loss.

This position is supported by applicable state law and "state law is important in determining when a trust relationship exists." *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 (6th Cir. 1982)). *See also, Baker v. Wentland (In re Wentland)*, 410 B.R. 585, 597 (Bankr. N.D. Ohio 2009) (noting that "the determination of whether an express or technical trust exists is governed by state law").

The parties entered into a partnership agreement and signed the agreement in Tennessee. [*See* Doc. No. 98-1, Trial Ex. 1.] The agreement provides that the company will do business at the Defendant's address in Tennessee. Under the Tennessee Revised Uniform Partnership Act, the law of the jurisdiction in which a partnership has its chief executive office governs relations among the partners and between the partners and the partnership. Tenn. Code. Ann. 61-1-106(a). Tenn. Code Ann. §§ 61-1-101 *et seq.* ("RUPA") states that partners owe each other fiduciary duties of loyalty and care. The Act provides:

> (a) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c).
> (b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:
> (1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the

23

appropriation of a partnership opportunity;

(2) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

(3) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

(c) A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(d) A partner shall discharge the duties to the partnership and the other partners under this act or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

(e) A partner does not violate a duty or obligation under this act or under the partnership agreement merely because the partner's conduct furthers the partner's own interest.

(f) A partner may lend money to and transact other business with the partnership, and as to each loan or transaction the rights and obligations of the partner are the same as those of a person who is not a partner, subject to other applicable law.

Tenn. Code Ann. § 61-1-404(a)-(f). The Tennessee legislature enacted the current version of

RUPA in 2001. In *Anderson v. Wilder*, a case decided in 2003 following the enactment of RUPA,

the court outlined the parameters of fiduciary duties between partners under Tennessee law:

> It is well-recognized that a fiduciary relationship exists between members of either a partnership or a closely-held corporation under established principles of both partnership law and corporate law. In *Lightfoot v. Hardaway*. . . the court stated as follows regarding business partnerships:
>
> > The fundamental rule that the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith and integrity in their dealings with one another with respect to partnership affairs is universally recognized in the modern cases and is reinforced by the Uniform Partnership Act.

*Anderson v. Wilder*, No. E2003-00460-COA-R3-CV, 2003 WL 22768666, at *4 (Tenn. Ct. App.

Nov. 21, 2003) (quoting *Lightfoot v. Hardaway*, 751 S.W.2d 844, 849 (Tenn. Ct. App. 1988)).

Having found a pre-existing fiduciary relationship recognized by the applicable state law,

the court finds that the Plaintiffs have met the first element of a claim for defalcation. With respect

24

to the second and third elements, the court has previously found that the instruction to pay Integrity

Log Homes rather than J&S and the deposit of money into the Integrity account rather than into the

partnership account, as required by the Agreement, were violations of his express partnership

obligations. The court has also found that the subsequent use of the funds for personal rather than

partnership use, and the Defendant's efforts to conceal his receipt of the $23,000 sufficiently

proved the Defendant's intent. Finally, the court has also found that the loss was $11,500.

### C.    Discharge Pursuant to 11 U.S.C. § 523(a)(6)

11 U.S.C. §§ 523(a)(6) states in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual
> debtor from any debt − . . .

> > (6) for willful and malicious injury by the debtor to another entity or
> > to the property of another entity . . . .

11 U.S.C. §§ 523(a)(2)(A), 523(a)(6). The same standards of proof and narrow construction apply

to this cause of action as they did with fraud and misrepresentation. The creditor must prove by a

preponderance of the evidence that a debt is nondischargeable under 11 U.S.C. § 523. *See Grogan

v. Garner*, 498 U.S. at 287, 111, S. Ct. at 659. Exceptions to discharge are narrowly construed in

the debtor's favor. *See Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th

Cir. 2004).

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by

analyzing federal law. *See e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01

(Bankr. N.D. Ohio 2001) (citing *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264 B.R.

866, 870 (Bankr. W.D. Ky. 2001; *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388 (Bankr.

N.D. Ohio 1999)). 11 U.S.C. § 523(a)(6) provides that a debt that is *both* willful *and* malicious is

nondischargeable. *See* 11 U.S.C. § 523(a)(6). "[T]he judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). The U.S. Supreme Court has addressed the meaning of "willful" within the context of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S. Ct. 974 (1998). As summarized by the Sixth Circuit:

> [t]he Court held that "willful" means "voluntary," "intentional," or "deliberate." As such, only acts done with the intent to cause injury – and not merely acts done intentionally – can cause willful and malicious injury.   The Court explained its holding by discussing the importance of context:
>
> > The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself."

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S. Ct. at 977).

Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *In re Markowitz*, 190 F.3d at 464. Such analysis requires a subjective inquiry into the debtor's state of mind. *See Whitaker*, 418 B.R. at 275. Mere proof of conversion is not sufficient to satisfy the requirements of § 523(a)(6). *See In re Jones*, 276 B.R. at 801.

Proof of willful behavior must often be demonstrated through the use of circumstantial

evidence. *See In re Jones*, 276 B.R. at 802. The bankruptcy court in *In re Jones* noted that "willful" behavior can "be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights." *Id.*

In this case, the court does not find that the Plaintiffs have proven that the Defendant willfully caused the loss of the $13,000 advance or the failure of the project and the subsequent loss of profits. The court does find that the taking of the $23,000 from Duff and depositing it to Integrity Log Homes was willful.

A malicious injury occurs "when a person acts in conscious disregard of their duties or without just cause or excuse." *In re Jones*, 276 B.R. at 803 (citing *Gonzalez v. Moffitt (In re Moffitt),* 254 B.R. 389, 396 (Bankr. N.D. Ohio 2000)). A finding of maliciousness does not require a determination of ill-will or specific intent. *See In re Trantham*, 304 B.R. at 308. However, malice requires the finding of a level of conduct beyond negligent or reckless behavior. *West Michigan Community Bank v. Wierenga (In re Wierenga)*, 431 B.R. 180, 185 (Bankr. W.D. Mich. 2010) (citation omitted); *see also, JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010); *Geiger*, 523 U.S. at 64, 118 S. Ct. 974. A creditor may prove the element of maliciousness by demonstrating that "(1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action." *In re Algire*, 430 B.R. at 823 (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991), *abrogated on other grounds as explained in In re Slosberg*, 225 B.R. 9, 18 n.10 (Bankr. D. Me. 1998)).

In *National Sign and Signal v. Livingston* the district court explained that the § 523(a)(6)

exception applies where the injury invades a creditor's legal rights. 422 B.R. 645, 653 (W.D.

Mich. 2009) (citing *Steier v. Best (In re Best)*, 109 F. App'x 1, 6 (6th Cir. 2004)). The district court

quoted the Sixth Circuit decision in *In re Best* noting:

> Section 523(a)(6)'s term "willful . . . means deliberate or intentional invasion of the
> legal rights of another, because the word 'injury' usually connotes legal injury
> (*injuria*) in the technical sense, not simply harm to a person." The conduct "must be
> more culpable than that which is in reckless disregard of creditors' economic
> interests and expectancies, as distinguished from . . . legal rights. Moreover,
> knowledge that legal rights are being violated is insufficient to establish malice. . . .

*Livingston*, 422 B.R. at 653 (quoting *In re Best*, 109 F. App'x at 6). The court in *Livingston* noted

that there are three elements that a creditor must demonstrate to state a claim under § 523(a)(6):

"(1) the debtor's conduct was willful and malicious, (2) it suffered an invasion of its legal rights or

to the legal rights to its property, and (3) the invasion was caused by the debtor's conduct." 422

B.R. at 653 (citing *CMEA Title Agency v. Little (In re Little)*, 335 B.R. 376, 383 (Bankr. N.D. Ohio

2005)).

   As to the $23,000, the court notes that $11,500 has been proven to have been used to pay

Mr. Stephens for his work. The use of those funds in that manner was not in violation of the

partnership's legal rights to those funds. The partnership received the benefit of those funds. Of the

remaining, $11,500, a check for $10,000 was written to the Defendant personally and $9,500 was

deposited into his account on the same day that $10,000 left the Integrity Homes Account. [Trial

Ex. 1 and 12.] In addition, he spent funds from the Integrity Log Homes account at convenience

stores, department stores, clothing stores, and a tanning salon. The court finds these appear to be

personal charges. The Defendant testified that he paid the remaining $1,500 from the $23,000 to

Mr. Stephens in cash, but the court finds that the information in the Integrity Log Homes account

does not bear that out. The court finds that the Debtor willfully and maliciously converted $11,500

of the $23,000 paid by Duff.

The excuse given by the Defendant for the use of the money for his personal benefit was that he was entitled to part of the money as his compensation as the dry-in subcontractor. His efforts to cover up his action in diverting the funds contradict this rationalization for taking the money. The court does not find the debtor's testimony about his reason for believing he was not violating Mr. Jenkins's and the partnership's right to those funds to be credible. Although the court finds that the Defendant willfully and maliciously harmed the Plaintiffs, the court has already awarded damages of the $11,500 based on other grounds. The court will award no additional damages based on willful and malicious injury.

### D.    Punitive Damages

The Plaintiffs also seek punitive damages. Tennessee courts maintain that "an award of punitive damages is limited to 'the most egregious cases' and is proper only where there is clear and convincing proof that the defendant has acted either 'intentionally, fraudulently, maliciously, or recklessly.' " *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n. 14 (Tenn. Sup. Ct. 2012) (citing *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. Sup. Ct. 2009) and *Hodges v. S.C. Toof & Co.*, 833 S.W. 2d 896, 901 (Tenn. Sup. Ct. 1992)). Punitive damages "are intended to 'punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him.' " *Goff*, 297 S.W.3d at 187. A bankruptcy court may award punitive damages for a Section 523(a)(6) claim if it finds that the standard for punitive damages under state law has been met. *See e.g. In re Hall*, No. 12-3026, 2013 WL 1739658, at *2-5 (Bankr. E.D. Tenn. Apr. 23, 2013).

The court does not find that punitive damages are warranted in this case. The Defendant

29

will not receive a discharge for the $11,500 he obtained. The court does not find that this case falls into a category of the most egregious cases. The court also sees little benefit in making a public example of this debtor to deter him from committing acts of a similar nature.

### E.     Attorneys' Fees

The Plaintiffs have also requested attorneys' fees. The court previously indicated that it would hold an additional hearing on attorney's fees in the event it determined that there was a nondischargeable debt. The court finds that there may be a right to collect attorney fees based on the analysis below and will therefore set a hearing to determine the basis for and the amount of the fees to be awarded.

> Under the "American Rule," each party pays its own attorney's fees arising out of litigation.[30] An exception exists, however, when specific authority granted by statute or contract—a so-called "fee-shifting" provision—states otherwise.[31] Since the Bankruptcy Code does not address whether creditors can recover attorney's fees in nondischargeability cases,[32] they can only do so if allowed by another statute or by contract.

*In re Kirk*, 525 B.R. 325, 330-31 (Bankr. W.D. Tex. 2015).

In *Cohen v. de la Cruz*, the U.S. Supreme Court held that attorneys' fees could be awarded in a Section 523 nondischargeability claim, if such damages were supported by an underlying state law. 523 U.S. 213, 223, 118 S. Ct. 1212, 1219 (1998). However, as one bankruptcy court explained, "it is clear that *Cohen* itself does not create an independent right to attorney's fees for the benefit of a party who prevails in a Section 523 dischargeability proceeding. Instead, it clarifies that attorney's fees supported by statute are included in the debt that may be determined to be non-dischargeable." *Headrick v. Atchison (In re Atchison)*, 255 B.R. 790, 793 (Bankr. M.D. Fla. 2000) (citing *Cohen*, 523 U.S. 213). Thus, a plaintiff is not entitled to attorneys' fees merely because of success on a nondischargeability claim.

30

Where there is no specific statute or contractual right to attorneys' fees, Tennessee law follows the American rule pertaining to the award of attorneys' fees with only a few limited exceptions. *See Pullman Standard, Inc. v. Abex Corporation*, 693 S.W.2d 336 (Tenn. Sup. Ct. 1985). In *Pullman*, the Tennessee Supreme Court noted that "[w]e continue to adhere to the rule in Tennessee that attorneys' fees are not recoverable in the absence of a statute or contract specifically providing for such recovery, or a recognized ground of equity . . . ." *Id.* at 338. The Court also noted two exceptions to this general rule, the indemnity rule and the independent tort rule. With respect to the indemnity rule, the court held "that the right of indemnity which arises by operation of law, based upon the relationship of the parties . . . includes the right to recover attorneys' fees and other litigation costs which have been incurred by the indemnitee in litigation with a third party." *Id.* The Court also adopted the independent tort theory exception, explained in the following way: " 'where the natural and proximate consequence of a tortious act of defendant has been to involve plaintiff in litigation with a third person, reasonable compensation for attorneys' fees incurred by plaintiff in such action may be recovered as damages against the author of the tortious act.' " *Id.* at 340 (quoting 42 A.L.R.2d 1183 (1956)). This court will give Mr. Jenkins an opportunity to offer additional evidence on whether he is seeking attorney fees under either of these theories.

The Plaintiffs claim that they have another basis for an award of fees under Tennessee law, citing *Francis v. Barnes*, No. W2012-02316-COA-R3-CV, 2013 WL 5372851, at *11 (Tenn. Ct. App. Sept. 23, 2013). In that case the court of appeals held that attorneys' fees could be awarded for a claim of intentional misrepresentation under Tennessee state law. *Id.*

> The Tennessee Supreme Court has held that the recipient of an intentional misrepresentation is entitled to recover the pecuniary loss to him of which the

31

> misrepresentation is a legal cause, including pecuniary loss suffered as a consequence of the recipient's reliance. *Hodge v. Craig,* 382 S.W.3d 325, 343 (Tenn. 2012) (citing *Boling v. Tennessee State Bank,* 890 S.W.2d 32, 35–36 (Tenn. 1994)). Additionally, we recognize that where property is wrongfully obtained through intentional misrepresentation, the sole way of dispelling another party's wrongful assertion of title is by hiring an attorney and litigation; otherwise, there is a risk of losing title by adverse possession. *Ezell v. Graves,* 807 S.W .2d 700, 703 (Tenn. Ct. App. 1990). Therefore, the costs of litigation flow directly from the defendant's conduct; they represent an actual pecuniary loss that should be recoverable. *Id.* Where attorney's fees are authorized by law, the trial court's decision to award them will not be reversed on appeal absent abuse of discretion. *Martin v. Moore,* 109 S.W.3d 305, 313–14 (Tenn. Ct. App. 2003) (citation omitted). We will only find an abuse of discretion where the court "applied incorrect legal standards, reached an illogical conclusion, based its discretion on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party."*Wright v. Wright,* 337 S.W.3d 166, 176 (Tenn. 2011) (quoting *Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.,* 249 S.W.3d 346, 358 (Tenn. 2008)).

*Francis v. Barnes*, No. W2012-02316-COA-R3CV, 2013 WL 5372851, at *11 (Tenn. Ct. App. Sept. 23, 2013).

*Francis* involved an action to set aside a real property transfer based on a claim of undue influence and intentional misrepresentation by the transferees. The trial court found fraud and awarded attorney's fees. The Tennessee Court of Appeals has also allowed attorney fees where a fiduciary has breached his duty in order to benefit himself.

> Although attorney fees should not be imposed where there is merely a technical fault on the part of the fiduciary, 622 S.W.2d at 560, the imposition of such fees on fiduciaries who deliberately use their position of trust to enrich themselves creates a disincentive to such behavior. The trial court's finding that Ms. Moore intentionally withdrew her husband's separate funds from his checking account for her sole use and benefit is an appropriate predicate for the trial court's award.

*Martin v. Moore*, 109 S.W.3d 305, 313 (Tenn. Ct. App. 2003).

This court has also found the taking of the $11,500 from the Duff payment for the dry-in to be a breach of fiduciary duty by misrepresentation. The court finds that under Tennessee law related to damages arising from misrepresentation, the Plaintiffs are entitled to attorney fees. The court will set a hearing to determine the amount of fees incurred for these claims.

**IV.     Conclusion**

The Plaintiffs have demonstrated all of the elements required under §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) by a preponderance of the evidence at trial with respect to damages of $11, 500. The court finds that the Plaintiffs hold a nondischargeable debt of $11,500 owed by the Defendant. Further, the court will award the Plaintiffs a judgment in that amount.

A separate order will be entered.

# # #